**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SKOKOMISH INDIAN TRIBE, a federally
recognized Indian tribe in its own
capacity as a class representative
and as parens patriae; DENNY S.
HURTADO; GORDON A. JAMES; JOSEPH
PAVEL; ANNE PAVEL; MAURES P.
TINAZA; CELESTE F. VIGIL; ROSLYNNE
L. REED; GARY W. PETERSON; RITA
C. ANDREWS; TOM G. STRONG; MARIE
E. GOULEY; VICTORIA J. PAVEL;
DENNIS W. ALLEN; JOSEPH ANDREWS,
SR.; ZETHA CUSH; ELSIE M. ALLEN;
ALEX L. GOULEY, JR.; LAWRENCE L.
KENYON; DORIS MILLER; GERALD B.
MILLER; HELEN M. RUDY; RONALD D.
TWIDDY, SR.; NICK G. WILBUR, SR.,
         *Plaintiffs-Appellants,*

         v.

UNITED STATES OF AMERICA; TACOMA
PUBLIC UTILITIES, a Washington
municipal corporation; CITY OF
TACOMA, a Washington municipal
corporation; WILLIAM BARKER,
Tacoma Public Utilities Board
Member in his official capacity; TOM
HILYARD, Tacoma Public Utilities
Board Member in his official
capacity; ROBERT LANE; TIM STREGE;
G. E. VAUGHN,
         *Defendants-Appellees.*

No. 01-35028

D.C. No.
CV-99-05606-FDB

SKOKOMISH INDIAN TRIBE, a federally recognized Indian tribe in its own capacity as a class representative and as parens patriae; DENNY S. HURTADO; GORDON A. JAMES; JOSEPH PAVEL; ANNE PAVEL; MAURES P. TINAZA; CELESTE F. VIGIL; ROSLYNNE L. REED; GARY W. PETERSON; RITA C. ANDREWS; TOM G. STRONG; MARIE E. GOULEY; VICTORIA J. PAVEL; DENNIS W. ALLEN; JOSEPH ANDREWS, SR.; ZETHA CUSH; ELSIE M. ALLEN; ALEX L. GOULEY, JR.; LAWRENCE L. KENYON; DORIS MILLER; GERALD B. MILLER; HELEN M. RUDY; RONALD D. TWIDDY, SR.; NICK G. WILBUR, SR., Skokomish Indian Tribal members for themselves and all others similarly situated,

> No. 01-35845
>
> D.C. No.
> CV-99-05606-FDB
>
> OPINION

*Plaintiffs-Appellants,*

v.

TACOMA PUBLIC UTILITIES, a Washington municipal corporation; CITY OF TACOMA, a Washington municipal corporation; WILLIAM BARKER, Tacoma Public Utilities Board Member in his official capacity; TOM HILYARD, Tacoma Public Utilities Board Member in his official capacity; ROBERT LANE; TIM STREGE; G. E. VAUGHN; UNITED STATES INTERNAL REVENUE SERVICE,

*Defendants-Appellees.*

Appeals from the United States District Court
for the Western District of Washington
Franklin D. Burgess, District Judge, Presiding

Argued and Submitted
March 23, 2004—San Francisco, California

Filed March 9, 2005

Before: Mary M. Schroeder, Chief Judge, Harry Pregerson,
Alex Kozinski, Pamela Ann Rymer, Susan P. Graber,
Ronald M. Gould, Richard A. Paez, Marsha S. Berzon,
Johnnie B. Rawlinson, Jay S. Bybee and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Kozinski;
Partial Concurrence and Partial Dissent by Judge Graber;
Dissent by Judge Berzon

## COUNSEL

Mason D. Morisset, Morisset, Schloser, Jozwiak & McGaw, Seattle, Washington, for the plaintiffs-appellants.

Philip H. Lynch, Assistant United States Attorney, Tacoma, Washington, for defendant-appellee the United States.

J. Richard Creatura, Gordon, Thomas, Honeywell, Melanca, Peterson & Daheim, LLP, Tacoma, Washington, for defendants-appellees the City of Tacoma and Tacoma Public Utilities.

Philip E. Katzen, Kanji & Katzen, PLLC, Seattle, Washington, for the amici curiae.

## OPINION

KOZINSKI, Circuit Judge:

Can an Indian tribe bring claims against the United States under the Federal Tort Claims Act for violation of a treaty, or against a city and a public utility under a treaty and 42 U.S.C. § 1983?

## FACTS

The Skokomish Indian Tribe ("Tribe") and its members brought suit in federal district court against the United States, the City of Tacoma ("City") and Tacoma Public Utilities ("TPU"), alleging harms caused by the Cushman Hydroelectric Project ("Project"), a City-owned project comprised of

two dams, two reservoirs, diversion works, two power houses and transmission lines. The Project, completed in 1930, floods over thirty acres of federal land in a total project area of 4700 acres located upstream from the Tribe's land. The Project has diverted the flow of the Skokomish River's North Fork to power-generating facilities and led to aggradation of the river.[1] This has allegedly caused flooding of the Tribe's reservation, failure of septic systems, contamination of water wells, blocking of fish migration, damage to the Tribe's orchards and pastures and silting over of many of the Tribe's fisheries and shellfish beaches. The Tribe claims the Project has caused it nearly $5 billion in losses.

The Tribe sued for damages resulting from the Project's impact on tribal lands and fisheries, alleging both state and federal causes of action, including claims arising under the Treaty of Point No Point ("Treaty"), Jan. 26, 1855, 12 Stat. 933. The Treaty ceded the Tribe's territory to the United States, but reserved a tract for the Tribe. It also reserved for the Tribe "[t]he right of taking fish at usual and accustomed grounds and stations . . . in common with all citizens of the United States" and "the privilege of hunting and gathering roots and berries on open and unclaimed lands." *Id.*, art. 4.

The district court dismissed the United States as a defendant and granted summary judgment in favor of the City and TPU on the treaty-based and state-law claims. The court also dismissed the Tribe's claim under 16 U.S.C. § 803(c) for failure to state a claim upon which relief could be granted. A divided panel of our court affirmed, but held that the district court should have dismissed the treaty-based claims for lack of subject matter jurisdiction. We took the case en banc. *Skokomish Indian Tribe* v. *United States*, 358 F.3d 1180, 1181 (9th Cir. 2004).

---

[1]Aggradation occurs when deposits of sediment cause the floor of the river to build up over time, leading to flooding and elevated water tables.

## ANALYSIS

### I.  Claims Against the United States

*A.  Treaty-Based Claims*

The Tribe seeks relief against the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346. The Tribe alleges that the United States violated its obligations under the Treaty by allowing continued operations of the Project and by failing to take legal action on the Tribe's behalf or fund litigation, thereby breaching its fiduciary responsibilities to the Tribe under the Treaty.

[1] These claims are not properly brought under the FTCA, which authorizes suits against the United States

> for injury or loss of property, or personal injury or death caused by the *negligent or wrongful act or omission* of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1) (emphasis added).[2] The Tribe's claims against the United States are properly characterized not as tort claims, but as claims that the United States violated its obligations under the Treaty. The claims are thus quite different from those in cases like *Berkovitz* v. *United States*, 486 U.S. 531 (1988), and *Indian Towing Co.* v. *United States*, 350 U.S.

---

[2]The FTCA also requires plaintiffs to exhaust their administrative remedies before bringing suit. *See McNeil* v. *United States*, 508 U.S. 106, 112 (1993). The Tribe met this requirement by filing an administrative claim for damages on September 22, 1997, which was rejected on November 20, 1997. *See* Amended Complaint at 32.

61 (1955), on which the Tribe relies. In *Berkovitz*, a federal agency allegedly acted tortiously in approving the release of a polio vaccine that did not meet safety standards. In *Indian Towing*, the Coast Guard acted negligently in its operation of a lighthouse because it did not "use due care to make certain that the light was kept in good working order," causing more than $60,000 in damages to a barge and its cargo. 350 U.S. at 69. The Tribe is not claiming the United States behaved tortiously, but rather that the United States failed to abide by its contractual obligations to the Tribe under the Treaty.

**[2]** The Tribe's claims may best be characterized as arising under the Tucker Act, 28 U.S.C. § 1491, or its counterpart for Indian claims, the Indian Tucker Act, 28 U.S.C. § 1505. The Tucker Act gives the Court of Federal Claims exclusive jurisdiction over claims for damages exceeding $10,000 that are "founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The Indian Tucker Act extends the Court of Federal Claims' jurisdiction to

> any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band or group.

28 U.S.C. § 1505.[3] It is under the Tucker and Indian Tucker Acts that the federal courts have considered claims most simi-

---

[3]The Indian Tucker Act is identical to the Tucker Act, except that it specifies Indian tribes as eligible claimants. The Indian Tucker Act was passed because there had been considerable doubt as to whether the Tucker Act applied to Indian tribes. *See* Gregory C. Sisk, *Yesterday and Today: Of Indians, Breach of Trust, Money, and Sovereign Immunity*, 39 Tulsa L. Rev. 313, 316 (2003).

lar to those of the Tribe. For example, in *United States* v. *Mitchell* (*Mitchell II*), 463 U.S. 206, 208 (1983), an Indian tribe brought a Tucker Act cause of action in the Court of Claims (the Court of Federal Claims' predecessor) against the United States for breach of trust responsibilities that originated with a treaty, which was later codified in federal law. This is very much like our case, in which the Tribe's claims against the United States are for breach of its fiduciary obligations under the Treaty.

**[3]** Because we lack subject matter jurisdiction over the Tribe's damages claims against the United States, but believe they might properly have been brought under the Indian Tucker Act, we exercise our discretion to transfer these claims to the Court of Federal Claims. *See* 28 U.S.C. § 1631 ("Whenever . . . an appeal, including a petition for review of administrative action, is noticed for or filed with . . . a court and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed . . . ."); *Beck* v. *Atl. Richfield Co.*, 62 F.3d 1240, 1242 n.4 (9th Cir. 1995) (per curiam).

## B.   *Federal Power Act Claims*

The Tribe also asserts the United States violated the Federal Power Act (FPA), 16 U.S.C. §§ 791a-828c, by failing to submit and include license conditions protective of the Skokomish Reservation fish and wildlife, to fully consider environmental factors before issuing a project license, and to require evidence that the City, as a license applicant, possessed sufficient water rights for the Project and complied with state and federal laws requiring fishways at dams and prohibiting impairment of navigation. The FPA, however, specifically provides: "Each licensee hereunder shall be liable for all damages occasioned to the property of others by the construction, maintenance, or operation of the project works

or of the works appurtenant or accessory thereto, constructed under the license, and *in no event shall the United States be liable therefor.*" 16 U.S.C. § 803(c) (emphasis added).

**[4]** The plain language of the FPA is clear. It differentiates between the United States and licensees, and unequivocally exempts the United States from liability. When the statutory language is clear, it trumps. *Lamie* v. *United States Tr.*, 124 S. Ct. 1023, 1030 (2004). We therefore affirm the district court's dismissal of all FPA claims against the United States.

## II.   Claims Against the City of Tacoma and Tacoma Public Utilities

### A.   *Treaty-Based Claims*[4]

---

[4]We reject defendants' contention that the FPA preempts the Tribe's treaty-based damages claims against the City and TPU. Defendants' argument is based on the fact that in 1924, the City received a license from the Federal Power Commission (FPC) authorizing the flooding of 8.8 acres of federal land that would result from the Project. *See City of Tacoma*, 67 F.E.R.C. ¶ 61,152, at 61,440 (1994). Defendants assert that the Tribe's treaty-based claims are actually collateral attacks on the licensing decision, which are governed by the FPA and which the district court lacked subject matter jurisdiction to consider. *See* 16 U.S.C. § 825*l*(b).

The 1924 license was a narrow "minor part" license, applying by its terms only to "the occupancy and use of a tract of land approximately 8.8 acres in area . . . said land constituting a minor part of said power project." As the Federal Energy Regulatory Commission—the FPC's successor—has recognized, the license did *not* "authorize the construction, operation, and maintenance of the Cushman Project." *City of Tacoma*, 67 F.E.R.C. at ¶ 61,440.

It is true that the FPA "provides *exclusive* jurisdiction for the Courts of Appeals to review and make substantive modifications to FERC licensing orders." *Cal. Save Our Streams Council, Inc.* v. *Yeutter*, 887 F.2d 908, 911 (9th Cir. 1989). But the Tribe is not attempting to collaterally attack the 1924 licensing decision; rather, it is suing for damages based on impacts that are not covered by the license. The FPA does not preempt the Tribe's treaty-based claims.

**[5] 1.**   A treaty between the United States and an Indian tribe "is essentially a contract between two sovereign nations." *Washington* v. *Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675 (1979) (*Fishing Vessel*). Nonetheless, treaties constitute the "supreme law of the land," *Breard* v. *Greene*, 523 U.S. 371, 376 (1998) (per curiam), and they have occasionally been found to provide rights of action for equitable relief against non-contracting parties, *see United States* v. *Winans*, 198 U.S. 371, 377 (1905).

Equitable relief, however, merely ensures compliance with a treaty; that is, it forces state governmental entities and their officers to conform their conduct to federal law. The Tribe here would have us go further and hold that it may recover monetary damages against the City and TPU for alleged treaty violations. We find no basis for doing so.[5]

**[6]** The Supreme Court has held that the Treaty of Point No Point and similar treaties are "self-enforcing" and thus do not require implementing legislation to form the basis of a lawsuit. *See Fishing Vessel*, 443 U.S. at 693 n.33. To make this determination, the Court looked at language common to the

---

[5]Judge Berzon's dissent misreads our opinion as assuming that "the cases upholding causes of action for violation of Indian treaty rights but providing only equitable relief implicitly held that damages are *not* available." Berzon dissent at 2986. We find only that those cases did not recognize an implied right of action for damages, and that there are no grounds for inferring that the parties to the Treaty intended to create such an action. *Cf. Gebser* v. *Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 284 (1998) (stating that courts implying rights of action "have a measure of latitude to shape a sensible remedial scheme that best comports" with the relevant enactment).

Similarly mistaken is the dissent's description of our opinion as holding that "Indian tribes and their members cannot, under federal law, sue municipalities for damages for violation of rights secured by Indian treaties." Berzon dissent at 2980. We analyze a specific set of claims brought under a specific treaty, and we thus have no occasion to consider whether different rights of action might be implied from other treaties.

treaties, which stated that the treaties "shall be obligatory on the *contracting parties* as soon as [they are] ratified by the President and Senate of the United States." *Id.* (emphasis added) (alteration in original) (internal quotation marks omitted); *see also* Treaty, art. 14. However, the City and TPU are not contracting parties to the Treaty. Nor is there anything in the language of the Treaty that would support a claim for damages against a non-contracting party. *Cf. Alexander* v. *Sandoval*, 532 U.S. 275, 286 (2001) ("The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy."); *Touche Ross & Co.* v. *Redington*, 442 U.S. 560, 568 (1979) ("[O]ur task is limited solely to determining whether Congress intended to create the private right of action asserted . . . . And as with any case involving the interpretation of a statute, our analysis must begin with the language of the statute itself.").

The Tribe has argued that in *Fishing Vessel* and *Puyallup Tribe* v. *Department of Game of Washington* (*Puyallup I*), 391 U.S. 392 (1968), the Supreme Court held that tribes may have a cause of action against non-contracting parties under a treaty, even in the absence of a specific treaty provision. But the Tribe misunderstands the significance of those cases. In *Fishing Vessel*, the Court interpreted a group of treaties, including the one at issue here, which granted Indian tribes " '[t]he right of taking fish, at all usual and accustomed grounds and stations . . . in common with all citizens . . . .' " 443 U.S. at 674 (quoting Treaty of Medicine Creek, Dec. 26, 1854, art. 3, 10 Stat. 1132, substantially similar to Treaty of Point No Point, art. 4). The Court held that this provision secured to the tribes the right to harvest a share of each run of anadromous fish that passed through tribal fishing areas and not merely a right to compete with non-treaty fishermen on an equal basis. *Id.* at 683-85. The tribes were thus entitled to an equal measure of the harvestable portion of each run that passed through a "usual and accustomed" tribal fishing

ground, adjusted downward if tribal needs could be satisfied by a lesser amount. *Id.* at 685-89.

The Court then held that its order was enforceable by injunction. *See id.* at 692 n.32. This is quite different from finding a right to sue a non-contracting party for damages under a treaty—a theory the Supreme Court avoided in *Fishing Vessel*.

*Puyallup I* is not to the contrary. In that case, the Court held that the State of Washington—a non-party to a treaty between the Puyallup Tribe and the United States—could regulate the modes of fishing allowed as an appropriate exercise of the State's police power because "the *manner* in which the fishing may be done and its purpose . . . are not mentioned in the Treaty." 391 U.S. at 398. The Court suggested that, even though the state could regulate in this instance, it could not pass legislation that would directly interfere with rights secured by a treaty. *See id.* ("We would have quite a different case if the Treaty had preserved the right to fish at the 'usual and accustomed places' *in the 'usual and accustomed' manner*."). But the Court did not hold that the Tribe had a private right of action under the Treaty for damages. In fact, the Puyallup Tribe did not bring a claim at all. It was the State of Washington that had sued the Tribe, seeking an injunction and declaratory relief that would allow the State to regulate certain fishing areas named in the Treaty. The Court did not consider whether the Tribe had a right of action even for equitable relief, let alone monetary damages going back nearly seventy-five years.

The Tribe gets no help from *Antoine* v. *Washington*, 420 U.S. 194 (1975). *Antoine* stands for the proposition that when a treaty has been implemented by Congress, "neither an express provision precluding state qualification nor the consent of the State [is] required" to subject a state to the provisions of the treaty. *Id.* at 205. Holding that a state is precluded from passing laws inconsistent with a treaty is quite different

from saying that a non-contracting party can be sued for damages under the treaty.

Finally, *County of Oneida* v. *Oneida Indian Nation*, 470 U.S. 226 (1985) (*County of Oneida II*), is inapposite. In that case, the Supreme Court found that the plaintiff tribes could assert a federal common law damages claim for unlawful possession of land. The Court's decision was not based on any treaty. Rather, it was based on well-established federal common law principles regarding aboriginal possessory rights in land. *See id.* at 235-36. By contrast, the Tribe in our case is seeking to collect damages for violation of fishing rights reserved to it by treaty.

**[7]** Thus, we hold that there is no basis for implying the right of action for damages that the Tribe seeks to assert.

**[8] 2.**    We turn next to the Tribe's claims under 42 U.S.C. § 1983. The Supreme Court recently held in *Inyo County* v. *Paiute-Shoshone Indians*, 538 U.S. 701, 708-12 (2003), that a Tribe is not a "person" capable of bringing a claim under section 1983 for violation of a sovereign prerogative. The Court reasoned that "qualification of a sovereign as a 'person' who may maintain a particular claim for relief depends . . . on the 'legislative environment' in which the word appears." *Id.* at 711 (quoting *Georgia* v. *Evans*, 316 U.S. 159, 161 (1942)). To illustrate circumstances in which sovereigns may assert claims under section 1983, the Court cited *Evans*, in which "a State, as purchaser of asphalt shipped in interstate commerce, qualified as a 'person' entitled to seek redress under the Sherman Act for restraint of trade." *Inyo County*, 538 U.S. at 711 (citing *Evans*, 316 U.S. at 160-63). It also cited *Pfizer Inc.* v. *Government of India*, 434 U.S. 308 (1978), which "held that a foreign nation, as purchaser of antibiotics, ranked as a 'person' qualified to sue pharmaceuticals manufacturers under our antitrust laws." 538 U.S. at 711 (citing *Pfizer*, 434 U.S. at 309-20).

**[9]** The Tribe here is not suing as an aggrieved purchaser, or in any other capacity resembling a "private person[ ]." *Id.* at 712. Rather, the Tribe is attempting to assert communal fishing rights reserved to it, as a sovereign, by a treaty it entered into with the United States. *See United States* v. *Washington*, 520 F.2d 676, 688 (9th Cir. 1975) ("The treaties must be viewed as agreements between independent and sovereign nations . . . . Each tribe bargained as an entity for rights which were to be enjoyed communally."). Recognizing that "[s]ection 1983 was designed to secure private rights against government encroachment," *id.* at 712, as well as the "longstanding interpretive presumption that 'person' does not include the sovereign," *Vt. Agency of Natural Res.* v. *United States ex rel. Stevens*, 529 U.S. 765, 780 (2000), we conclude that the Tribe may not assert its treaty-based fishing rights under section 1983.[6]

As for the individual members of the Tribe, while we have suggested that some treaty-based rights might be cognizable on behalf of a tribe's members under section 1983, *see United States* v. *Washington*, 813 F.2d 1020, 1023 (9th Cir. 1987), we have noted that the hallmark for determining the scope of section 1983 coverage is whether the right asserted "is one 'that protects the individual against government intrusion,' " *Hoopa Valley Tribe* v. *Nevins*, 881 F.2d 657, 662 (9th Cir. 1989) (quoting *White Mountain Apache Tribe* v. *Williams*, 810 F.2d 844, 848 (9th Cir. 1987)). In *Hoopa Valley*, for instance, we held that section 1983 could not be used to enforce a collective right to tribal self-government.

---

[6]In her dissent, Judge Berzon relies on *United States* v. *Washington*, 935 F.2d 1059 (9th Cir. 1991) (*Washington II*). Berzon dissent at 2992-93. But in that case we ruled only that lower courts must distinguish "between litigation defining and enforcing" treaty rights in determining whether attorney's fees should be awarded under 42 U.S.C. § 1988. *Id.* at 1061. We did not consider, let alone resolve, whether Indian tribes may properly sue as "persons" under section 1983 for violation of treaty-based rights; the question does not appear to have been raised.

**[10]** The Tribe's treaty-based rights do not give rise to individual actions cognizable under section 1983. As we stated in *Settler* v. *Lameer*, 507 F.2d 231, 237 (9th Cir. 1974), with regard to fishing rights similar to those that the Tribe's members assert here, "the fishing rights reserved in [the relevant treaty] are communal rights of the Tribe, even though the individual members benefit from those rights." *See also Whitefoot* v. *United States*, 293 F.2d 658, 663 (Ct. Cl. 1961) (noting that "interests in . . . fisheries are communal, subject to tribal regulation").[7] Because the Tribe's members seek to

---

[7]Judge Berzon disagrees with our conclusion in significant part based on *Kimball* v. *Callahan*, 590 F.2d 768 (9th Cir. 1979) (*Kimball II*), where we reaffirmed our prior holding in *Kimball* v. *Callahan*, 493 F.2d 564 (9th Cir. 1974) (*Kimball I*), that an individual Indian "possessing treaty rights to hunt, fish, and trap" on a former reservation "retained those rights even though he relinquished his tribal membership pursuant to" a tribal termination act. *Kimball II*, 590 F.2d at 772. As the dissent concedes, however, the *Kimball* cases "did not involve a suit brought under § 1983." Berzon dissent at 2934. Moreover, the cases dealt with the rights of individual Indians after their tribe was terminated. Indeed, we expressly distinguished *Washington*, 520 F.2d at 688, and *Whitefoot*, 293 F.2d at 663, on the ground that "[n]either of these cases . . . was concerned, as was *Kimball I*, with the tribal rights of individual Indians upon the termination of a tribe." *Kimball II*, 590 F.2d at 772. Our case likewise does not involve claims made by individual Indians after the tribal entity has been terminated.

*Kimball II* further limited *Kimball I* by noting that "the court's statement [in *Kimball I*] that treaty rights to hunt and fish are rights of the individual Indian must be understood within the context of the two cases cited in its support." *Id.* at 772-73 (footnote omitted). The first of these cases, *McClanahan* v. *Arizona State Tax Commission*, 411 U.S. 164 (1973), "involve[d] the narrow question whether the State may tax a reservation Indian for income earned exclusively on the reservation," *id.* at 168, and was based on the general policy of "leaving Indians free from state jurisdiction and control," *id.* (quoting *Rice* v. *Olson*, 324 U.S. 786, 789 (1945)) (internal quotation marks omitted). The second, *Mason* v. *Sams*, 5 F.2d 255 (W.D. Wash. 1925), dealt with whether "the Commissioner of Indian Affairs could enforce regulations made by him without tribal consent which required [tribe members] to pay a royalty for the fish they caught in reservation streams to be used by the Tribe for the care of the aged and destitute members of the Tribe and for general agency purposes." *Kimball II*, 590 F.2d at 773. Here, by contrast, the Tribe's members are not attempting to challenge governmental regulation of individual Indians. Our opinions in *Kimball I* and *Kimball II*, then, provide little guidance.

vindicate communal, rather than individual rights, they do not have cognizable section 1983 claims against the City or TPU.[8]

**[11]** We therefore affirm the district court's grant of summary judgment in favor of the City and TPU. The Tribe's claims cannot be asserted under the Treaty or under section 1983.

## B.   Reserved Water Rights Claim

The Tribe also sues on the theory that the City has violated water rights that were impliedly reserved to the Tribe when it entered into the Treaty with the United States.

**[12]** In *Winters* v. *United States*, 207 U.S. 564 (1908), the Supreme Court held that federal reservations of public land can sometimes carry implied property rights in appurtenant waters. "While many of the contours of what has come to be called the 'implied-reservation-of-water doctrine' remain unspecified, the Court has repeatedly emphasized that [the

---

[8]The Tribe argues that section 1983 protects communal rights. But the cases on which the Tribe relies do not support its position. In *Romero* v. *Kitsap County*, 931 F.2d 624 (9th Cir. 1991), we acknowledged that section 1983 claims for deprivations of treaty rights may be cognizable "under specified circumstances," *id.* at 627 n.5 (citing *Hoopa Valley*, 881 F.2d at 661-63), but we offered no additional insight into the issue. *Romero* itself was brought by, among others, individual tribal members who were arrested for gathering shellfish in areas they claimed were treaty-protected. The individuals brought suit under section 1983 against the officers who arrested them. This was a traditional section 1983 suit for unlawful arrest, clearly distinguishable from our case.

Similarly, *Shoshone-Bannock Tribes* v. *Fish & Game Commission*, 42 F.3d 1278 (9th Cir. 1994), addressed whether the plaintiff actually intended to sue officers of the Idaho Fish and Game Commission in their individual capacities under section 1983. *See id.* at 1284-85. Following a close textual analysis of the complaint, we held that it did name one officer in his individual capacity, alleging violations of the Due Process and Equal Protection Clauses, as well as treaty rights. We did not consider when a section 1983 claim could be brought to vindicate treaty rights.

United States] reserved 'only that amount of water necessary to fulfill the purpose of the reservation, no more.' " *United States* v. *New Mexico*, 438 U.S. 696, 700 (1978) (quoting *Cappaert* v. *United States*, 426 U.S. 128, 141 (1976)). The Court has found implied water rights stemming from a reservation of public land only where "without the water the purposes of the reservation would be entirely defeated." *Id.* But "[w]here water is only valuable for a secondary use of the reservation, . . . there arises the contrary inference that [the United States] intended, consistent with its other views, that the [reservation] would acquire water in the same manner as any other public or private appropriator." *Id.* at 702.

**[13]** The district court concluded that the water diverted by the City was not necessary for any primary purpose of the reservation. The Tribe argues that this was error, contending that the City has infringed upon its implied water rights in the Skokomish River by impeding its ability to fish. We agree with the district court that the Tribe cannot survive summary judgment with its claim that fishing was a primary purpose of the reservation.

The Tribe directs us to submitted declarations from a historian and a cultural anthropologist, but these declarations only suggest that fishing was important to the Tribe, and that the United States intended to ensure the Tribe was not excluded from its fisheries. Demonstrating that the United States intended for the Tribe to continue fishing on the reservation is not the same as showing that fishing was a primary purpose of the reservation. *Cf. id.* at 716 ("While Congress intended the national forests to be put to a variety of uses, including stockwatering, not inconsistent with the two principal purposes of the forests, stockwatering was not itself a direct purpose of reserving the land."); *id.* at 716-17 ("Congress, of course, did intend to secure favorable water flows, and one of the uses to which the enhanced water supply was intended to be placed was probably stockwatering. But Congress intended

the water supply from the Rio Mimbres to be allocated among private appropriators under state law.").

Nor does the Treaty language help the Tribe. The Treaty merely provides that the Tribe shall have "[t]he right of taking fish . . . in common with all citizens of the United States." Treaty, art. 4. This language distinguishes our case from *United States* v. *Adair*, 723 F.2d 1394 (9th Cir. 1984), where we based our finding of implied water rights in part on treaty language "expressly provid[ing] that the [plaintiff Indian Tribe] will have *exclusive* on-reservation fishing and gathering rights." *See id.* at 1409 (emphasis added). The Treaty language in this case cannot make up for the inadequacy of the evidence the Tribe has presented.

**[14]** We thus conclude that the district court properly granted summary judgment for defendants on the Tribe's reserved water rights claim.

## C.   State-Law Claims

The Tribe brought a series of state-law claims against the City and TPU based on the property damage resulting from aggradation of the Skokomish River. The claims included inverse condemnation, trespass, tortious interference with property, conversion, negligence, negligent misrepresentation, private and public nuisance, and violation of Washington Revised Code section 4.24.630, which prohibits persons from going onto the land of another and wrongfully causing waste or injury to the land or to personal property. We find that all of the Tribe's state-law claims are barred by the applicable statutes of limitations.

**[15]** Under Washington law, the statute of limitations for inverse condemnation is ten years. *Highline Sch. Dist. No. 401* v. *Port of Seattle*, 548 P.2d 1085, 1089 (Wash. 1976). The statutes of limitations for trespass, negligence, conversion, tortious interference, nuisance and actions under Wash-

ington Revised Code section 4.24.630 are three years. *See* Wash. Rev. Code § 4.16.080.[9]

---

[9]The Tribe argues that the Indian Claims Limitation Act of 1982 ("ICLA"), 28 U.S.C. § 2415, preserves the Tribe's aggradation-related claims. Under the ICLA, claims brought by Indian tribes are subject to a six-year and ninety-day statute of limitations, unless preserved by publication in the Federal Register. Any cause of action not published in the Federal Register is barred sixty days after the date of publication. *Id.* Claims included on the list are not barred until after the Secretary of the Department of the Interior either (1) publishes in the Federal Register a notice of rejection of the claim, and a complaint is not filed by the claimant within one year of the Federal Register notice; or (2) submits a legislative proposal to Congress, in which case any right of action on that claim is barred unless the claimant files a complaint within three years of the submission to Congress. *Id.* "So long as a listed claim is neither acted upon nor formally rejected by the Secretary, it remains live." *County of Oneida II*, 470 U.S. at 243.

The ICLA does not apply to state-law claims, as the Tribe conceded at argument. Instead, we apply state statutes of limitations to state-law claims. *See Nev. Power Co.* v. *Monsanto Co.*, 955 F.2d 1304, 1306 (9th Cir. 1992). But even if the ICLA were to apply, the Tribe's state-law claims are distinct from the preserved fishery claims. The Tribe preserved claims relating to "fishery" damage caused by the Cushman Dam. Though there is not much evidence in the record detailing the preserved claims, the Solicitor of the Department of the Interior described them as based on "[d]estruction of fishery by diversion of water for hydroelectric project on North Fork River." Supp. E.R. at 404K. In a letter submitted to Congress urging an extension of the statute of limitations, the Tribe described its preserved claims as follows:

> The first case is a major fisheries damage claim against the City of Tacoma. During the 1920's, the City of Tacoma constructed a complex of two high dams on the North Fork of the Skokomish River, thus diverting its entire flow to power generating facilities located on the Skokomish Indian Reservation . . . . The diversion . . . destroyed the most significant fish producing stream of the Skokomish River system and its excellent runs of salmon and steelhead.

Supp. E.R. at 406-07.

The state-law claims concern the effect of aggradation on tribal property, whereas the preserved claims center around the diversion of water

The district court found that the Tribe's aggradation-related claims began to accrue no later than February 16, 1989. On that date, Russell Busch, then attorney for the Tribe, wrote a letter to Gary Hansen at the Washington Department of Ecology, stating:

> Please consider this letter both a formal protest and an intergovernmental comment by the Skokomish Indian Tribe with regard to the referenced water rights Applications for Permit and any other water use authorizations sought by the City of Tacoma in the Skokomish River Basin.
>
> . . .
>
> The Skokomish Tribe resides upon a federal Indian Reservation on the Skokomish River downstream from the Applicant's [City of Tacoma] diversions and impoundments. It is the position of the Tribe that Applicant's actions reduce the natural flow of the river in such a way that: (1) Indian treaty fisheries are seriously reduced both on the Reservation and at other usual and accustomed places, in violation of the Treaty of Point No Point; (2) the federal reserved water rights of the Skokomish Reservation are unlawfully interfered with; and (3) the reduction of tributary inflow caused by Tacoma's

---

and loss of fish. The Tribe itself admits that it did not know about the aggradation-related damage when it listed its claims under the ICLA in the early 1980s. *See* Appellant's Opening Br. at 40. Though the Tribe urges us to construe its preserved claims liberally to include aggradation-related damages, *see id.* (citing *Montana* v. *Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985)), the requirement that we interpret statutes and treaties broadly in favor of Indian tribes cannot be extended to reach cases where a particular interpretation could not have been contemplated by the parties. Thus, even if the ICLA were applicable, it would not extend any of the Tribe's state-law claims.

> impoundments and diversions is a direct and proximate cause of channel aggradation and flooding on [and] above the reservation.

Supp. E.R. at 408.

**[16]** We agree with the district court that this was the applicable date of accrual. Though the Tribe argues that this is a factual issue that should have been submitted to the jury, where there is clear evidence of when the claims accrued, the court may make this determination. *See Reichelt* v. *Johns-Manville Corp.*, 733 P.2d 530, 535-36 (Wash. 1987); *Fradkin* v. *Northshore Util. Dist.*, 977 P.2d 1265, 1268 (Wash. Ct. App. 1999). To start the statute of limitations running in Washington, all that is required is:

> [W]hen a plaintiff is placed on notice by some appreciable harm occasioned by another's wrongful conduct, the plaintiff must make further diligent inquiry to ascertain the scope of actual harm. The plaintiff is charged with what a reasonable inquiry would have discovered. Stated more succinctly, the law does not require a smoking gun in order for the statute of limitations to commence.

*Giraud* v. *Quincy Farm & Chem.*, 6 P.3d 104, 109 (Wash. Ct. App. 2000) (internal quotation marks and citations omitted). Busch's "formal protest" of the Project in 1989 is sufficient to meet this standard. Thus, because the Tribe did not file its complaint until November 19, 1999, more than ten years after its aggradation-related claims accrued, its claims are time-barred.

**[17]** There is an exception to the statute of limitations for certain trespass claims. Where a plaintiff can show that its claim is a "continuing" violation, "the statute of limitation serves only to limit damages to those incurred in the three-year period before the suit was filed." *Fradkin*, 977 P.2d at

1267. To show a continuing violation, the plaintiff must demonstrate that the damage is "reasonably abatable," *id.*, which means that "[t]he condition . . . can be removed 'without unreasonable hardship and expense,' " *id.* at 1270 n.25 (quoting *Mangini* v. *Aerojet-Gen. Corp.*, 912 P.2d 1220, 1225 (Cal. 1996)). It is the plaintiff's burden to prove reasonable abatability. *See Mangini*, 912 P.2d at 1225-26.

**[18]** The district court held that the Tribe's alleged damages were not reasonably abatable, precluding a finding of a continuing violation. The Tribe's expert estimated the value of the Tribe's property before the damage at $2,170,040. Supp. E.R. at 410, 421. The same expert estimated the total remediation cost at $3,770,500. *Id.* Given this large discrepancy between the cost of repair and the actual value of the land, it is clear that the damages could be abated only with unreasonable hardship and expense.[10] The district court correctly concluded that there was no continuing violation.

*D.    16 U.S.C. § 803(c)*

The Tribe also claims the City and TPU violated 16 U.S.C. § 803(c), which requires licensees to maintain project works in a condition so as not to impair navigation. Section 803(c) provides that "[e]ach licensee hereunder shall be liable for all damages occasioned to the property of others by the construction, maintenance, or operation of the project works or of the

---

[10]In her dissent, Judge Graber relies on the license that FERC issued to the City in 1998, which directed the City to file a plan for "enhancing the channel conveyance capacity of the mainstem Skokomish River." *See* E.R. at 177; Graber dissent at 2976-77, 2978-79. But the license states only that the cost of financing the plan may be no more than $5 million, and the Tribe offers no reason to think the actual cost of abatement would be materially less than this maximum. As for Judge Graber's reliance on the possibility that the cost of abatement might "perhaps" be lower than the remediation cost estimates offered by the Tribe, *see* Graber dissent at 2979, the Tribe cannot overcome defendants' motion for summary judgment on the basis of such conjecture.

works appurtenant or accessory thereto, constructed under the license, and in no event shall the United States be liable therefor."

The district court dismissed for failure to state a claim upon which relief could be granted, holding that section 803(c) does not provide a private right of action. This follows the Second Circuit's decision in *DiLaura* v. *Power Authority of State of N.Y.*, 982 F.2d 73 (2d Cir. 1992), and the D.C. Circuit's decision in *South Carolina Public Service Authority* v. *FERC*, 850 F.2d 788 (D.C. Cir. 1988).

**[19]** *DiLaura* and *South Carolina Public Service Authority* held that section 803(c) does not create a federal private right of action, but instead preserves only existing state-law claims against licensees. *DiLaura*, 982 F.2d at 77-79; *S.C. Pub. Serv. Auth.*, 850 F.2d at 793-95. Their holdings were based on a reading of the statute as well as its legislative history. The legislative history revealed that all discussion during the floor debates centered on the premise that "damages caused by licensees should be determined in accordance with state law." *Id.* at 795. As the D.C. Circuit explained, since "Congress intended for [the statute] merely to preserve existing state laws governing the damage liability of licensees, it follows that the Commission may not encroach upon this state domain by engrafting its own rules of liability." *Id.* We believe this interpretation of section 803(c) is the correct one and thus see no cause for parting company with our sister circuits. We affirm the district court's dismissal of the Tribe's section 803(c) claim.

## III. Recusal Motion

The Tribe also appeals the district court's denial of its motion to disqualify the district judge. Sixteen months after filing its complaint, and after the district court had already ruled on a number of claims, the Tribe asserted that Judge Burgess had an obligation to recuse himself because he was

a utility customer, and the outcome of the case might substantially affect his utility bill. Judge Burgess denied the motion, finding it untimely. The Tribe moved for reconsideration, and Judge Burgess again denied recusal. Judge Burgess then referred the motion to Chief District Judge Coughenour, who also held it was untimely, because Judge Burgess had already ruled on at least fifteen different motions and trial was less than five months away.

[20] A motion for recusal must be made with "reasonable promptness after the ground for such a motion is ascertained." *Preston* v. *United States*, 923 F.2d 731, 733 (9th Cir. 1991); *see also Wood* v. *McEwen*, 644 F.2d 797, 802 (9th Cir. 1981) (per curiam) (waiting sixteen months after discovering the grounds for recusal was untimely and resulted in a waiver). The Tribe knew it was litigating a case against TPU in Tacoma federal court, before a Tacoma-area judge. It should have known when it filed its complaint that it might want to seek recusal of the judge assigned to the matter. At the very least, the Tribe admits that it believed it had grounds for recusal at least seven months before filing the motion. The district court thus did not abuse its discretion in denying the recusal motion. *See Kulas* v. *Flores*, 255 F.3d 780, 783 (9th Cir. 2001).[11]

## IV.   Class Certification

Because we affirm the district court, we need not address the district court's denial of class certification. *See Alexander* v. *Whitman*, 114 F.3d 1392, 1398 n.7 (3d Cir. 1997) (because the court held that dismissal of the complaint was proper, it did not need to address the propriety of the district court's denial of plaintiffs' motion for class certification).

---

[11]We do not, of course, express a view as to the merits of the recusal motion; nothing we say should be read as implying that a timely motion would have been successful.

**AFFIRMED IN PART AND TRANSFERRED TO THE COURT OF FEDERAL CLAIMS IN PART.**

---

GRABER, Circuit Judge, with whom PREGERSON, PAEZ, and BERZON, Circuit Judges, join, concurring in part and dissenting in part:

I concur in the majority opinion with two exceptions. First, with respect to the right of individual members of the Tribe to bring a § 1983 claim against the City and TPU, I agree with Judge Berzon's dissent at pages 2992-95. Second, I disagree with the majority's conclusion that the statute of limitations has run on the Tribe's Washington-law claims for nuisance and trespass. Under Washington law, even a permanent structure (like a dam or a sewer) can result in a "continuing" nuisance or trespass. If there is a "continuing" nuisance or trespass, then the plaintiff can seek damages for the three years immediately preceding the filing of the complaint, because the act for which damages are sought is a present, ongoing act rather than a past, completed act. Here, a question of fact remains concerning the proper application of the statute of limitations.

Under Washington law the difference between a "permanent" nuisance or trespass and a "continuing" nuisance or trespass is that the latter is "reasonably abatable," that is, the defendant can take curative action to stop the continuing damages. 16 Wash. Prac., *Tort Law and Practice* § 9.13 (2d ed.). The question of "permanent" versus "continuing" nuisance or trespass is separate from the question of damages or remediation of consequential harms, even though money is involved in each analysis. For example, a trespass can cause huge damages but be very cheap to fix, or vice versa.

The Tribe has produced sufficient evidence to raise a genuine issue of material fact as to whether the aggradation alleg-

edly caused by the Cushman Dam Project's diversion of the North Fork of the Skokomish River is reasonably abatable. To survive summary judgment, the Tribe had to produce evidence from which a rational finder of fact could conclude that the aggradation of the Skokomish River's mainstem can be abated "without unreasonable hardship and expense." *Fradkin v. Northshore Util. Dist.*, 977 P.2d 1265, 1270 (Wash. Ct. App. 1999).

Two pieces of evidence support the Tribe's claim that the aggradation is reasonably abatable. First, at least two of the Tribe's technical consultants stated that aggradation can be abated by dredging the river or decreasing the amount of water diverted away from the North Fork.[1] Second, Tacoma's 1998 license from FERC directed it to develop "specific cost-effective measures proposed to increase the channel conveyance capacity" of the Skokomish mainstem, including "flow manipulation [and] flushing flows."

The FERC order supports the Tribe's showing, for summary judgment purposes, that these measures to abate aggradation would be feasible. In Fradkin, the court held that

---

[1]One technical analyst opined:

> Flushing flow releases from Cushman would be more effective in transporting sediment through the mainstem Skokomish if the mainstem channel was made deeper through dredging. . . . Restoration of the natural sediment transport capacity of the river would lessen, halt or possibly even reverse the current trends in aggradation. At the very least, it would address the portion of the aggradation problem attributable to the Cushman Project.

Another concluded:

> Restoring and maintaining a mainstem conveyance capacity of 13,000 cfs will contain the 1.3-year flow event within the banks of the channel. This will afford the Tribe the same level of flood protection, in terms of the probability and frequency of overbank flow, that existed under natural conditions. This will protect approximately 1,400 acres of Reservation lands from the effects of frequent flooding.

summary judgment was improper where the plaintiff had produced a report recommending certain measures to remedy the condition (and where the trespassing utility had itself attempted to fix the problem). *Id.* The court did not discuss the cost of such measures or the value of the plaintiff's property in relation to these measures. *Id.* In *Jacques v. Pioneer Plastics, Inc.*, 676 A.2d 504 (Me. 1996) (cited in *Fradkin*, 977 P.2d at 1270 n.23), a document even more similar to the FERC order sufficed to raise a genuine issue of material fact: a compliance order from a state agency that directed the contaminating parties to submit a remediation feasibility study. *Id.* at 508. Several courts have noted that abatability is not necessarily a return to the status quo ante or a complete elimination of the problem. *See, e.g.*, *Mangini v. Aerojet-Gen. Corp.*, 912 P.2d 1220, 1226 (Cal. 1996) ("something less than total decontamination may suffice to show abatability") (cited in *Fradkin*, 977 P.2d at 1270 n.23); *Beck Dev. Co. v. S. Pac. Transp. Co.*, 52 Cal. Rptr. 2d 518, 558 (Ct. App. 1996) (noting that "the ability to remediate to levels demanded by the regulatory agencies was sufficient abatability"); *Hanes v. Cont'l Grain Co.*, 58 S.W.3d 1, 4 (Mo. Ct. App. 2001) ("We disagree . . . that in order to show a nuisance can be abated, it must be shown that the entire nuisance can be eliminated, and a reduction or lessening of the nuisance is insufficient. . . . A nuisance can be abated to the degree where it is no longer a substantial interference.").

There is evidence in the record from which a reasonable finder of fact could conclude that abatement of the aggradation itself is economically feasible. The 1998 FERC license states that the "cost-effective" measures to increase mainstem conveyance capacity are not to exceed $5 million. For summary judgment purposes we should presume that FERC considered the reasonableness of this sum, as well as the feasibility of the measures, in relation to the economic situation of the City and the Cushman Dam Project. For this reason, I believe that, for summary judgment purposes under Washington law, the FERC order is sufficient evidence that

abatement of mainstem aggradation could be economically feasible.

The majority, in contrast, concludes that abatement is unreasonable as a matter of law, because the cost of remediating the damage to property caused by the aggradation and associated flooding is about 75 percent more than the value of the Tribe's property in its prior condition. Maj. op. at 2973. I do not agree that this price tag renders the condition unabatable as a matter of law. Moreover, the cited estimate of remediation costs is primarily for repairs to sewer and water-delivery systems and to flood-damaged homes. It does not address the perhaps much lower cost to abate the aggradation itself, by way of dredging or flushing flows. The aggradation is the underlying condition caused by the diversion of water by the Cushman Project and it should be the focus of the abatability inquiry.[2]

In conclusion, I am persuaded that the Tribe's state-law claims for nuisance and trespass survive summary judgment on statute of limitations grounds.[3] I respectfully dissent from the majority's contrary conclusion.

---

BERZON, Circuit Judge, dissenting in part,[1] with whom PREGERSON, PAEZ, and RAWLINSON, Circuit Judges, concur:

---

[2] *Cf. Castaic Lake Water Agency v. Whittaker Corp.*, 272 F. Supp. 2d 1053, 1072 (C.D. Cal. 2003) (holding that deposition testimony regarding a $36 million treatment program for drinking water affected by contamination did not support the plaintiff's claim of abatability because the treatment facility would not abate "the actual nuisance—namely, the underground contamination").

[3] I have not considered, and express no opinion on, the City's alternative arguments for granting summary judgment on the merits of the Tribe's trespass and nuisance claims.

[1] I dissent only from subsections A ("Treaty-Based Claims") and B ("Reserved Water Rights Claim") of Part II ("Claims Against the City of Tacoma and Tacoma Public Utilities") of the majority opinion.

According to the majority, Indian tribes and their members cannot, under federal law, sue municipalities for damages for violation of rights secured by Indian treaties. The case law simply does not support the majority's broad pronouncement. Indeed, *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226 (1985) (*County of Oneida II*), is quite directly to the contrary, permitting suits for damages under federal common law for violation of aboriginal rights reserved by treaty.

More specifically, Supreme Court precedent, as well as cases from the courts of appeals, support the conclusions that (a) both tribes and individual members of tribes may sue municipalities for damages for violations of the tribes' treaty rights; and (b) individual tribe members may sue under 42 U.S.C. § 1983 for violations of their asserted right to take fish at the usual and accustomed times. The majority's contrary assertions largely ignore two centuries of understandings concerning the federal protection of Indian aboriginal and treaty-based rights — in particular, the understanding that Indian treaties in large part simply *preserve* some pre-existing aboriginal rights in exchange for cession of a portion of Indian land. Whether the majority's conclusions would make sense if we were developing the law of Indian rights to the use of land and water afresh — which I do not think they would — is not the question, as we are not free to reinvent established doctrine. I therefore respectfully dissent.[2]

---

[2]Because the majority does not reach the questions raised in this case that logically follow a determination that these plaintiffs may bring suit for damages against these defendants — including whether the federal causes of action are barred by statutes of limitations or preserved by the Indian Claims Limitation Act (ICLA), 28 U.S.C. § 2415 note, and whether the Treaty of Point No Point ("Treaty"), 12 Stat. 933 (1855), in fact establishes the rights claimed — I do not do so either.

I do note that the most challenging question thus left open is whether the Tribe's off-reservation fishing rights give rise to a cause of action for limiting the numbers of fish that formerly inhabited the streams and rivers in which the Tribe traditionally fished, or whether, instead, the Treaty pre-

# I

Without examining what pre-existing rights, if any, the Tribe reserved under the Treaty of Point No Point ("Treaty"), 12 Stat. 933 (1855),[3] the majority mistakenly dismisses all possibility that the Tribe can seek damages for violations of any such rights. This conclusion — induced by a misplaced focus on cases concerning attempts to imply causes of action from statutes or from international treaties — ignores settled precedent concerning *Indian* treaty-protected rights. The scope of a cause of action to enforce Indians' aboriginal rights, including such rights reserved in treaties with the United States, cannot sensibly be resolved by invoking lines of authority developed in areas of the law lacking the long tradition of federal common law protection accorded Indian property and related rights. As the majority's reasoning fails

serves only a right to take a given proportion of such fish as remain extant. This court previously addressed that important question but subsequently vacated the decision and has not since had occasion to resolve it. *See United States v. Washington*, 694 F.2d 1374 (9th Cir. 1982), *on en banc reh'g*, 759 F.2d 1353, 1355 (9th Cir. 1985) (failing to determine whether "the right to take fish necessarily includes the right to have those fish protected from man-made despoliation"); *see also Kittitas Reclamation Dist. v. Sunnyside Valley Irrigation Dist.*, 763 F.2d 1032, 1033, 1035 (9th Cir. 1985) (approving district court order releasing water from a water project to preserve nests of salmon eggs so as to preserve the Indian right of taking off-reservation fish "in common with citizens"); *Nez Perce Tribe v. Idaho Power Co.,* 847 F.Supp. 791, 810 (D. Idaho 1994) (holding that a Northwest Indian treaty similar to the one in this case "does not provide a guarantee that there will be no decline in the amount of fish available to take"); CONFERENCE OF W. ATTORNEYS GEN., AMERICAN INDIAN LAW DESKBOOK 330-33 & n.194 (Clay Smith ed., 3d ed. 2004) (noting that "[m]any commentators have advocated a treaty-based habitat protection right" and citing to the commentary).

[3]The Treaty of Point No Point is one of a series of treaties brokered by Territorial Governor Isaac Stevens in the mid-1800's between the United States and various Pacific Northwest Indian tribes. These treaties are commonly referred to as "Stevens treaties." *See generally Nez Perce Tribe*, 847 F. Supp. at 805-06.

to appreciate the uniquely federal nature of the land, water, and fishing claims by Indians, it is largely beside the point. There are hard issues in this case concerning the precise import of several precedents concerning Indians' treaty-protected rights, but the majority's simplistic approach misses them all.

I note at the outset that the majority is quite correct in recognizing — albeit in passing — that rights of action are available for equitable relief against "non-contracting" parties to Indian treaties. *Ante* at 2961. From this starting point, however, the majority rushes to the unsupported conclusion that a Tribe may not recover monetary damages for alleged treaty violations. In doing so, the majority makes three major missteps: (1) conflating interpretation of this Indian Treaty with a private cause of action under non-Indian treaties and federal statutes; (2) asserting that the non-signatory status of Tacoma Public Utilities ("TPU") and the City of Tacoma ("City") somehow absolves those entities of responsibility here; and (3) conjuring a distinction between damages and equitable relief inconsistent with binding authority.

(1)   The majority rests its constrained interpretation of the rights reserved by — and the relief available to enforce — this Treaty upon a foundation of wholly irrelevant cases. Cases construing Title VI of the Civil Rights Act (*Alexander v. Sandoval*, 532 U.S. 275 (2001)) or the Securities Exchange Act of 1934 (*Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979)) have little relevance to the interpretation of Indian treaties.[4] The Supreme Court has made clear that Indian treaties are unique, governed by different canons of construction than

---

[4] Also, a simple glance at the text of the Treaty here at issue reveals that it might still provide a cause of action for members of the Tribe. The Treaty does speak to individuals, namely the Tribe's members, with regard to the "right of taking fish": Although land is reserved "for the present use and occupation of the said tribes and bands," "[t]he right of taking fish at usual and accustomed grounds and stations is further secured *to said Indians*," not to the "tribes and bands." (emphasis added).

those that apply to statutes and other treaties. *See, e.g., County of Oneida II*, 470 U.S. at 247-48.

Moreover, there is no general rule preferring equitable relief over damages when implying a cause of action. Rather, were the statutory private cause of action cases pertinent, they would not support any distinction between equitable and damages relief, unless there is some indication that Congress specifically intended such a distinction. *Sandoval*, 532 U.S. at 286 ("The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy."); *Touche Ross & Co.*, 442 U.S. at 568 ("[O]ur task is limited solely to determining whether Congress intended to create the private right of action asserted . . . . And as with any case involving the interpretation of a statute, our analysis must begin with the language of the statute itself."). The majority points to no indication that Congress intended to allow suits in equity but not for damages to enforce Indian fishing rights reserved by treaties.

In short, the cases cited by the majority for the proposition that equitable but not damages relief is available with regard to rights reserved by a federal Indian treaty are of no help at all in establishing that point.

(2)   In addition to its reliance on inapposite strands of case law, the majority also suggests that, even if the Treaty is self-enforcing, the Treaty cannot be enforced against the City and TPU because they are non-contracting parties.[5] No case cited

---

[5]The majority's focus on "non-contracting parties" suggests that because the City and TPU are not signatories to the Treaty, they are somehow less responsible to respect the rights reserved by the Treaty than is the federal government. This suggestion would appear to call into question bedrock understandings concerning the judicial enforcement against municipal governments of the obligation to abide by federal law.

The City and TPU, as governmental entities, are bound by the rights reserved in the Treaty. Cities and local governments are, of course, subject

by the majority, and no case I have discovered, supports the conclusion that rights created in an Indian Treaty can only be enforced by one signatory against the other, whether for equitable relief *or* for damages. Instead, the cases relying on the principle that states and their agents are bound to respect treaty-created rights are legion. *See, e.g.*, *County of Oneida II*, 470 U.S. at 235-36 (approving a federal common law suit against two counties for violation of federal aboriginal rights partly secured by treaty); *Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 669-70 (1979) (*Fishing Vessel*) (suit brought by the United States "on

to the Supremacy Clause. As "the constitutionality of local ordinances is analyzed in the same way as that of statewide laws" for purposes of the Supremacy Clause, *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985) (citation omitted), cities and local governments cannot pass ordinances or laws that " 'interfere with, or are contrary to,' federal law." *Id.* at 712 (citing *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824)); *see Brendale v. Confederated Tribes & Bands of the Yakima Indian Nation*, 492 U.S. 408, 431 (1989) (plurality opinion) ("Since the tribes' protectible interest is one arising under federal law, the Supremacy Clause requires state and local governments, including Yakima County zoning authorities, to recognize and respect that interest in the course of their activities."); *see also C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 394-95 (1994); *Cmty. Communications Co. v. City of Boulder*, 455 U.S. 40, 57 (1982); *City of Burbank v. Lockheed Air Terminal, Inc.* 411 U.S. 624, 640 (1973); *City of Chicago v. Atchison, Topeka & Santa Fe Ry. Co.*, 357 U.S. 77, 84-85 (1958); *Asakura v. City of Seattle*, 265 U.S. 332, 343 (1924); *City of Auburn v. Qwest Corp.*, 260 F.3d 1160, 1175-76 (9th Cir. 2001); *United States v. City of Pittsburg*, 661 F.2d 783, 785-86 (9th Cir. 1981); *Nat'l Helicopter Corp. of Am. v. City of New York,* 137 F.3d 81, 92 (2d Cir. 1998); *Pirolo v. City of Clearwater*, 711 F.2d 1006, 1010 (11th Cir. 1983).

Treaties are listed among the types of law that make up "the supreme Law of the Land." U.S. Const. art. VI, cl. 2 (Supremacy Clause) ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."). Cities and local governments therefore are bound, under the Supremacy Clause, to respect rights created by or reserved in Indian treaties.

its own behalf and as trustee for seven Indian tribes" against the State of Washington to enforce treaty rights; other tribes, the state's Fisheries and Game Departments, and one commercial fishing group were joined as parties); *United States v. Washington*, 157 F.3d 630, 638 (9th Cir. 1998) (suit brought by numerous Indian tribes and the United States (on the tribes' behalf) against the State of Washington to enforce treaty rights; several private parties intervened and appealed); *Kimball v. Callahan*, 493 F.2d 564, 565 (9th Cir. 1974) (suit brought by individual Indians against officers of the State of Oregon to enforce treaty rights).

Further, as the majority recognizes, *United States v. Winans*, 198 U.S. 371 (1905), enforced Indian treaty rights even against *private* third-parties. So did *United States v. Washington*, 157 F.3d at 657.

In *Winans*, the United States, on behalf of certain members of the Yakima Nation, brought suit to enjoin private land owners from preventing Indians' exercise of their off-reservation treaty rights to fish on the defendants' private property. *See* 198 U.S. at 377. The Court held that the treaty between the United States and the Tribe "fixe[d] in the [now privately owned] land such easements as enable the right to be exercised." *Id.* at 384. Explained *Winans*:

> The right to resort to the fishing places in controversy was a part of larger rights possessed by the Indians . . . which were not much less necessary to the existence of the Indians than the atmosphere they breathed. . . . [T]he treaty was not a grant of rights to the Indians, but a grant of right from them — a reservation of those not granted. . . . [The treaty] imposed a servitude upon every piece of land as though described therein. . . . The contingency of the future ownership of the lands, therefore, was foreseen and provided for — in other words, the Indians were given a right in the land — the right of crossing

it to the river — the right to occupy it to the extent and for the purpose mentioned. No other conclusion would give effect to the treaty. And the right was intended to be continuing against the United States and its grantees *as well as against the State and its grantees . . . .*

*Id*. at 381-82 (emphasis added). Similarly, *United States v. Washington* held that, "[i]n light of *Winans*, *Fishing Vessel*, and the [Stevens] Treaties' language and power as the supreme law of the land, the district court correctly determined that the Tribes have a right to harvest shellfish *on private tidelands*." 157 F.3d at 647 (emphasis added).

(3)    So, then, if the Treaty is self-enforcing *and* the Treaty can be enforced against non-contracting parties, what is left of the majority's assertion that the Tribe cannot seek damages for elimination of fishing rights secured by a treaty? To fill this gap, the majority asserts, repeatedly but without citation to any pertinent authority, that in a case involving a nonsignatory to the Treaty, there is a determinative distinction in enforcing these rights between an action for damages and an action for equitable relief. *Ante at* 2961-62.

The entirety of the majority's reasoning on this point seems to be that the cases upholding causes of action for violation of Indian treaty rights but providing only equitable relief implicitly held that damages are *not* available. In neither *Fishing Vessel* nor *Puyallup Tribe v. Department of Game of Washington*, 391 U.S. 392 (1968), however, were the Indians seeking damages. *See Fishing Vessel*, 443 U.S. at 670 (suit "seeking an interpretation of the treaties and an injunction requiring the State to protect the Indians' share of anadromous fish runs"); *Puyallup Tribe*, 391 U.S. at 394 ("These suits were brought by respondents in the state court against the Indians for declaratory relief and for an injunction."). That, presumably, is why the availability of damages was not discussed; courts are not in the habit of commenting on the

availability of relief no one wants. So, even if this availability of damages were a question of first impression, the majority would need more than its ipse dixit to support the damages/equitable relief distinction central to its conclusion.

More important, the question before us emphatically is not one regarding an undecided question. There is binding authority supporting awarding monetary relief when Indians seek to enforce their aboriginal rights, including such rights reserved in a treaty.

The first sentence of Justice Powell's opinion in *County of Oneida II* explains: "These cases present the question whether three Tribes of the Oneida Indians may bring a suit *for damages* for the occupation and use of tribal land allegedly conveyed unlawfully in 1795." 470 U.S. at 229 (emphasis added). To answer this question, the Court explored at some length the historical availability of federal causes of action to enforce Indian aboriginal rights, whether secured by treaties or not, concluding that "Indians have a federal common[ ]law right to sue to enforce their aboriginal land rights." *Id.* at 235. Consequently, the Oneidas could maintain their damages action "for violation of their possessory rights based on federal common law." *Id.* at 236. Moreover, this circuit, citing *County of Oneida II*, has similarly affirmed the ability of an Indian tribe to bring a damages action against a public utility based upon a *federal* common law cause of action. *See United States v. Pend Oreille Pub. Util Dist. No. 1*, 28 F.3d 1544, 1549 n.8 (9th Cir. 1994);[6] *see also Mescalero Apache Tribe v. Burgett Floral Co.*, 503 F.2d 336, 338 (10th Cir. 1974). This authority makes plain that Indian tribes *may* bring a damages action under federal common law to enforce their rights to use of land.

---

[6]We agreed in *Pend Oreille* with the plaintiffs' argument that "damages for trespass on Indian lands are controlled by federal law." 28 F.3d at 1549; *see also id.* at 1549 n.8 (citing *County of Oneida II* for support).

A closer examination of the nature of the Tribe's claimed rights further reveals the majority's fundamental misunderstanding of the very claim it summarily dismisses. Like the Oneidas,[7] the Tribe here is not simply seeking to enforce rights *created* by the Treaty. Rather, it is claiming to enforce an aboriginal right — the right "of taking fish at *usual and accustomed* grounds and stations" (emphasis added) — *reserved* in the Treaty. *See Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 677 (1974) (*County of Oneida I*) (characterizing the right claimed by the Tribe as one in which "federal law now protects, and has continuously protected from the time of the formation of the United States, possessory right to tribal lands, wholly apart from the application of state law principles which normally and separately protect a valid right of possession"); *see also Winans*, 198 U.S. at 381-82.

In this instance, the primary right at issue is not a claim to plenary possession of land but, instead, a claim of right to both the kind of "servitude" enforced in *Winans*, and to a preservation of the fish flow itself. This distinction might matter were we to consider, on the merits, the asserted reach of the rights reserved in the Treaty. But there is no conceptual distinction that would explain why the right to possession asserted in *County of Oneida II*, *if it existed* (which is what the bulk of that opinion addressed, *see* 470 U.S. at 233-40) would support a cause of action for damages, while the fish-

---

[7]That the asserted aboriginal right here is enshrined in a treaty does not separate this case from the *County of Oneida* precedents. The Oneidas' challenge to the 1795 cession by the state of New York was predicated in part upon the "Indians' right to possession under the federal treaties" between the United States and the Oneidas in the 1780s and 1790s. *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 664-65 (1974) (*County of Oneida I*). As is true here, "the right to possession itself is claimed to arise under federal law in the first instance. Allegedly, aboriginal title of an Indian tribe guaranteed by treaty and protected by statute has never been extinguished." *Id.* at 676. The majority is thus wrong in stating otherwise. *Ante at 2964.*

ing rights here asserted, *if they exist* (which neither the majority nor I address, see *supra* note 2) would not.

For these reasons, as the above-quoted language from *Winans* suggests, the prism through which the majority is viewing the treaty rights issue is inverted. The majority proceeds on the premise that federal enforcement of rights traceable to an Indian treaty always follows the same principles as enforcement of treaties with nondomestic nations. But Indian fishing rights, as *Winans* indicates, were not *granted* by the treaties; rather, they were *reserved* by the treaties and are traceable to aboriginal possessory interests, given up in part in treaties. As such, the rights thus derived are enforceable, if at all, under federal common law. *See County of Oneida II*, 470 U.S. at 233-36; *Nez Perce Tribe v. Idaho Power Co.,* 847 F.Supp. 791, 799-800 (D. Idaho 1994) (holding that the federal common law action recognized in *County of Oneida I* is available for damages actions based on purported tribal fishing rights, noting that "the Tribe's right to fish is aboriginal in origin, as it was in [*County of Oneida I*], and is reinforced by federal common law and the 1855 treaty.").

Once more, so to state is not to settle the question whether the rights here asserted — to preserve fish runs from destructions — *were* reserved by the Treaty of Point No Point. *See supra* note 2. It is only to say that *if* the right was reserved, it is enforceable in a damages action under the federal common law. In failing to acknowledge that possibility, and, instead, resting on inappropriate analogies to treaties with foreign governments and on federal statutes having nothing to do with Indian rights, the majority reaches a conclusion in direct conflict with binding law.

## II

After concluding that treaties, though self-enforcing and enforceable in equity against third parties, may not be enforced in damages against a party other than the signatories,

the majority goes on to hold that neither the tribe nor any individual members may bring suit under 42 U.S.C. § 1983. This conclusion, like the conclusion that there is no possible federal common law cause of action for damages based upon treaty-secured rights, reflects an inattention to nuance in the case law with regard to the rights of Indian tribes and their members.

First, the majority relies upon *Inyo County v. Paiute-Shoshone Indians of the Bishop Community*, 538 U.S. 701 (2003), to support its conclusion that the Tribe may not, because of its status as a sovereign, bring a claim under section 1983. *See ante* at 2964.

*Inyo County* held that a tribe may not sue under § 1983 to vindicate a right held solely because of its status as a sovereign. *See Inyo County*, 538 U.S. at 712. As the majority recognizes, *ante* at 2964, this narrow holding leaves open the possibility that a tribe may bring suit to vindicate rights similar to those held by private persons. *See id.* at 711 (discussing cases in which the Supreme Court had held states and foreign nations to be "persons").

The Tribe here, unlike the tribe in *Inyo County*, did not base any of its § 1983 claims on rights or privileges held as a sovereign (e.g. sovereign immunity), but rather on fishing rights assertedly traceable to federal law and therefore beyond the authority of local governmental entities to impair, because of the Supremacy Clause. No special immunity premised on sovereignty as such is claimed. Instead, the underlying right asserted is one akin to a property right or a water right, commonly held by private parties, including entities such as corporations or associations. *Compare id.* at 714 ("[T]he Tribe rests its case entirely on its claim that, as a sovereign, it should be accorded a special immunity that private casinos do not enjoy.") (Stevens, J., concurring in the judgment). *Inyo County* therefore does not settle whether for purposes of this

case, the Tribe qualifies as a "person" who may sue under § 1983 to vindicate the rights asserted in its complaint.

*Hoopa Valley Tribe v. Nevins*, 881 F.2d 657 (9th Cir. 1989), is not to the contrary. *Hoopa Valley* held that "[b]ecause the right to tribal government protects the powers conferred upon the tribe, and not individual rights, it falls outside the scope of § 1983." *Id.* at 662. But, as in *Inyo County*, the tribe in *Hoopa Valley* was attempting to assert a tribal government right, held solely because it was a sovereign — namely, its freedom from state taxation.

*Hoopa Valley* also relies on a distinction between "power conferring provisions" and "rights conferring provisions" of federal law, holding that "power conferring provisions, such as the Supremacy Clause," are not rights that can be vindicated under § 1983. *Id.* While the Supremacy Clause cannot, by itself, form the basis of a § 1983 claim, see *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107 (1989), that is because the Supremacy Clause " 'is not a source of any federal rights.' " *Id.* (citation omitted). In *Dennis v. Higgins*, 498 U.S. 439 (1991), however, the Supreme Court upheld a cause of action under § 1983 based on the Commerce Clause, rejecting the argument that the Commerce Clause could not be the basis of a § 1983 cause of action because it "merely allocates power between the Federal and State Governments and does not confer 'rights.' " *Id.* at 447. The Court instead held that the Commerce Clause both was a "power allocating" provision *and* constituted a "substantive restriction on permissible state regulation of interstate commerce." *Id.* (internal quotation marks and citation omitted). Somewhat similarly, in *Golden State Transit Corp.*, the Court held that rights created by the National Labor Relations Act can support a § 1983 action, because in that circumstance " 'pre-emption follows . . . as a matter of substantive right.' " 493 U.S. at 110 (quoting *Brown v. Hotel & Restaurant Employees Int'l Union Local 54*, 468 U.S. 491, 503 (1984)).

Here, the bases of the Tribe's § 1983 claims are the Takings and Due Process Clauses of the federal Constitution, although the fishing rights assertedly unconstitutionally taken are traceable to the Treaty (and, ultimately, to aboriginal possession). While it was a treaty in this instance that assertedly preserved the fishing rights, in other instances similar Indian fishing and hunting rights are preserved by agreement or statute, not treaty. *See Antoine v. Washington*, 420 U.S. 194, 200-01 (1975). The rights here at issue, then, unlike the self-governmental status central in *Inyo County* and *Hoopa Valley Tribe*, are only indirectly and marginally connected to the sovereign status of the Tribe. Private entities can also assert Takings and Due Process claims, tracing their asserted property rights to federal grants, reservations, agreements or statutes. I would therefore be inclined to hold that § 1983 is available to remedy the violations of federal law alleged by the Tribe.[8]

I need not answer that question definitively, however, as I am quite certain that a § 1983 suit can be maintained by the individual tribe members. The majority's reasoning to the contrary runs thus: The only rights cognizable under § 1983 are individual rights; the Tribe's right to fish is a communal right; therefore, individual members may not bring suit to enforce their fishing rights.

Before addressing this syllogism, I note that there is no support for the more general proposition that treaty-based rights cannot support a § 1983 cause of action, period. The only case that even suggests as much, *United States v. Washington*, 813 F.2d 1020 (9th Cir. 1987) (*Washington I*), held only that claims resulting solely in the interpretation of trea-

---

[8]Once again, I am not addressing the merits questions whether the Treaty in fact creates or preserves the asserted right, and whether, if so, impairing that right violates § 1983. The only question addressed by the majority, and therefore the only one I address, is whether the Tribe is entitled to a judicial answer to those questions.

ties are not cognizable under § 1983, but that if a state "violates these now known and well-delineated rights, there would be an actual conflict between state and federal law which might give rise to a § 1983 action." *Id.* at 1023 (citation omitted). So even this (rather odd) holding indicates that there are cases in which violations of rights secured in part by Indian treaties can give rise to § 1983 claims. And, in fact, we have so recognized in a later appeal in *United States v. Washington*, 935 F.2d 1059 (9th Cir. 1991) (*Washington II*), where we awarded fees under 42 U.S.C. § 1988, explaining:

> [T]he case before us differs from these earlier cases in a single critical respect: while previous litigation has attempted to define the treaty rights, [this proceeding] is purely an action to enforce them. . . .
>
> The tribes are entitled to section 1988 fees to enforce such well-defined treaty rights.

*Id.* at 1061 (citation omitted).

In light of *Washington II*, *Washington I* should be reconsidered rather than relied upon. Ordinarily, whether a case is cognizable under § 1983 does not turn on whether the rights are well-established or not, although qualified immunity does turn upon that consideration. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Wong v. U.S. INS*, 373 F.3d 952, 966 (9th Cir. 2004). The pertinent precedent for present purposes is therefore *Washington II*, recognizing that Indian treaty fishing rights can give rise to a § 1983 action.

As to the majority's individual fishing rights syllogism, this circuit has granted relief to individual tribe members suing to enforce their treaty fishing rights. *See Kimball*, 493 F.2d at 569-70 (granting declaratory relief to individual Indians suing to enforce their rights to hunt, trap, and fish within the Klamath Indian Reservation free of Oregon fish and game regulations, pursuant to a Treaty). *Kimball* was later cited by the

Supreme Court in support of the proposition that "[s]uch treaty rights [as the right to hunt and fish] can be asserted by Dion as an individual member of the Tribe." *United States v. Dion*, 476 U.S. 734, 738 n.4 (1986). *Dion* cited for this proposition, in addition to *Kimball*, *Winans* and *United States v. Felter*, 752 F.2d 1505 (10th Cir. 1985). *Id.*

While *Kimball* did not involve a suit brought under § 1983, it did reject the logic of the majority opinion: that individual tribe members may not enforce treaty fishing rights because they are communal. As *Kimball* explained:

> Although the treaty giving exclusive fishing rights to the Quinaielts was with the Tribe, the court held [in *Mason v. Sams*, 5 F.2d 255 (W.D. Wash. 1925)] that the right of taking fish was a right common to the members of the Tribe and that "a right to a common is the right of an individual of the community." [*Id.*].
>
> From *Mason* it is clear that an individual Indian enjoys a right of user in tribal property derived from the legal or equitable property right of the Tribe of which he is a member.

590 F.2d at 773 (quoting *Mason*, 5 F.2d at 258) (parallel citation omitted). The hunting and fishing rights at issue in *Kimball*, like the fishing rights here, were non-exclusive rights. *See id.* at 774.[9]

---

[9]*Settler v. Lameer*, 507 F.2d 231 (9th Cir. 1974), and *Whitefoot v. United States*, 293 F.2d 658 (Ct. Cl. 1961), upon which the majority rely, were decided before both *Kimball* and *Dion*. Also, they concern the question whether the individual fishing rights are subject to tribal regulation, not whether individual rights *consistent* with tribal regulation may be asserted by individual Indians. *Settler*, 507 F.3d at 232; *Whitefoot*, 293 F.2d at 661, 663. As such, they are not informative with respect to the problem before us.

Individual Indians have brought a number of § 1983 cases in the district courts to enforce their treaty rights. While I recognize these opinions do not squarely address whether the individual plaintiffs have stated a cognizable cause of action under § 1983, they do indicate that other courts have found this marriage of treaty rights and § 1983 to be acceptable. *See, e.g., Canadian St. Regis Band of Mohawk Indians ex rel. Francis v. New York*, 278 F. Supp. 2d 313 (N.D.N.Y. 2003); *Oyler v. Finney*, 870 F. Supp. 1018 (D. Kan. 1994), *aff'd*, 52 F.3d 338 (10th Cir. 1995) (unpublished table decision); *Mille Lacs Band of Chippewa Indians v. Minnesota*, 853 F. Supp. 1118 (D. Minn. 1994), *aff'd*, 124 F.3d 904 (8th Cir. 1997), *aff'd*, 526 U.S. 172 (1999); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Wisconsin*, 663 F. Supp. 682 (W.D. Wis. 1987), *appeal dismissed*, 829 F.2d 601 (7th Cir. 1987) (per curiam); *Sohappy v. Smith*, 302 F. Supp. 899 (D. Or. 1969), *aff'd in part,* 529 F.2d 570 (9th Cir. 1976) (per curiam).

I would therefore hold that the individual Indians may bring suit under § 1983 asserting violation of treaty-secured fishing rights.

### III

With respect, finally, to plaintiffs' reserved water rights claims under *Winters v. United States*, 207 U.S. 564 (1908), the majority concludes that the Tribe fails to show, for purposes of surviving summary judgment, that there is a factual dispute concerning whether preserving its ability to fish was a primary purpose of its reservation under the Treaty.[10] The majority's water rights analysis, once again, entirely disregards binding precedent, proceeding as if both the reserved

---

[10]That language comes from article 4 of the Treaty and explains that "[t]he right of taking fish at usual and accustomed grounds and stations is further secured to said Indians, in common with all citizens of the United States . . . ."

water doctrine and the interpretation of treaty fishing rights language were matters of first impression. They are not.

Taking these questions in reverse order:

(1)   I do not believe that the interpretation of the "right of taking fish" language is *directly* controlling on the reserved water rights issue. Reserved water rights cases usually concern preservation of water flows of rivers and streams appurtenant to a federal reservation. *See, e.g., Winters*, 207 U.S. at 566-67; *Joint Bd. of Control v. United States*, 832 F.2d 1127, 1131 (9th Cir. 1987); *United States v. Adair*, 723 F.2d 1394, 1408 (9th Cir. 1983). The Treaty fishing language, in contrast, pertains primarily to off-reservation fishing, preserving fishing rights on non-reservation land that is accessible to both Indians and non-Indians. *See, e.g., Fishing Vessel*, 443 U.S. at 674-85.

This majority is wrong, however, in stating that the "right of taking fish" language is not pertinent at all in establishing, for purposes of the *Winters* doctrine, that preserving a fishing culture was a primary purpose of the reservation. *Ante* at ____. The "taking fish" language indicates awareness by the parties to the Treaty of the importance of fishing to the Tribe. Surely, if the parties were concerned enough with protecting the Tribe's access to fish to create easements over private land so as to allow *off*-reservation fishing, *see Winans*, 198 U.S. at 381, they would also be centrally concerned with preserving the Tribe's ability to fish in water accessible *on* the reservation itself.

Further, decades of hard-fought litigation concerning Northwest Indian fishing rights have resulted in a Treaty interpretation, ignored by the majority, that supports the Tribe's position. *Fishing Vessel* concerned the meaning of identical treaty language to that in this case. *See* 443 U.S. at 674. In *Fishing Vessel*, the Washington Game Department and, later, the State of Washington, proposed an "equal oppor-

tunity" approach to the language, arguing that "the treaties gave the Indians no fishing rights not enjoyed by non-treaty fishermen except the two rights previously recognized by decisions of this Court — the right of access over private lands to their usual and accustomed fishing grounds." *Id.* at 671 (citations omitted).

The Supreme Court, however, unequivocally rejected such an approach. The Court held that the treaty language does *not* mean that Indians have only the same right as individual non-Indians, but rather, that they retain a right to a portion of the fish runs in an amount "so much as . . . is necessary to provide the Indians with a livelihood — that is to say, a moderate living." *Id*. at 677, 686. While the percentage distribution can vary depending upon factual conditions,[11] the salient point is that the "treaty guarantees the Indians more than simply the 'equal opportunity' along with all of the citizens of the State to catch fish, and it in fact assures them some portion of each relevant run." *Id.* at 681-82. In so ruling, *Fishing Vessel* exhaustively reviewed the treaty language itself, additional language in the treaties, and six of the Court's precedents, concluding that the treaty language is "unambiguous" and that all of the Court's precedents reject an "equal opportunity" approach. *See id.* at 674-84.

The majority ignores this binding treaty interpretation, relying instead on the absence of any language assuring *exclusive* on-reservation fishing rights. For present purposes, however, the question is not whether any fishing rights reserved are *exclusive*. Rather, what is here pertinent is that the treaty *does* reserve a right to take fish that goes beyond that held by citizens generally. That interpretation of the treaty, commanded

---

[11]"[A]n equitable measure of the common right should initially divide the harvestable portion of each run that passes through a 'usual and accustomed' place into approximately equal treaty and nontreaty shares, and should then reduce the treaty share if tribal needs may be satisfied by a lesser amount." *Fishing Vessel*, 443 U.S. at 685.

by the precedents, supports the conclusion that a primary purpose of entering into the Treaty and establishing the reservation was preserving the Indians' ability to engage in subsistence fishing.

(2)    Looking at the record as a whole, including the treaty language, I would hold that the Tribe made a sufficient factual showing on summary judgment that preserving the Tribe's fisheries was a primary purpose of agreeing to the Treaty and creating the reservation.

In interpreting Indian treaties, we pay particular attention to the sense in which the Indians would naturally have understood the treaty. As *Fishing Vessel* explained:

> When Indians are involved, this Court has long given special meaning to this rule. It has held that the United States, as the party with the presumptively superior negotiating skills and superior knowledge of the language in which the treaty is recorded, has a responsibility to avoid taking advantage of the other side. "[T]he treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians."

443 U.S. at 675-76 (quoting *Jones v. Meehan*, 175 U.S. 1, 11 (1899) (alteration in original)). As noted, fishing was sufficiently important to the Tribe that even off-reservation fishing rights were enshrined in the Treaty, suggesting that the Tribe would not have agreed to the Treaty were it not assured that it could continue its traditional fishing way of life. In addition, there is expert historical evidence in the record so indicating,[12]

---

[12]For example, Richard White, Professor of American History at Stanford University and an expert on the Stevens treaties and the Puget Sound tribes, wrote that:

and indicating as well that the United States saw preservation of the Tribe's fisheries as essential to the Treaty.[13]

Moreover, the evidence that TPU and the City offer to refute the Tribe's claim is not enough to support summary judgment. They assert that a primary purpose of the reservation is agriculture. Assuming that to be true, such a purpose would not preclude finding that *another* primary purpose of the reservation was fishing. There does not have to be only one primary purpose to a reservation. *See Adair*, 723 F.2d at 1410 ("Neither *Cappaert*[, 426 U.S. 128 (1976),] nor *New Mexico*[, 438 U.S. 696 (1978),] requires us to choose between [agriculture or hunting/fishing] or to identify a single essential purpose which the parties to the 1864 Treaty intended the Klamath Reservation to serve."); *see also Colville Confederated Tribes v. Walton*, 647 F.2d 42, 48 (9th Cir. 1981) (holding that there was an implied reservation of water for fishing grounds while recognizing that both "[p]roviding for a land-

---

When read with a real attempt to discern Indian concerns, the treaty journals reveal a concern on the part of the Indians for preserving their entire subsistence cycle and particularly the full range of the species in their fisheries. What Indians wanted was access to their customary food resources.

[13]Professor White's declaration reports, relying on documents concerning the negotiation of the Stevens treaties, that Stevens promised the Indians that "as for food, you yourselves now, as in times past, can take care of yourselves . . . you will have the means and the opportunity to cultivate the soil to get your potatoes *and* to go over these waters in your canoes to get your fish." (emphasis added). Professor White goes on to explain:

Stevens's desire for Indians to have permanent access to fish, including shellfish, makes perfect sense given his ambitions for the treaty. Permanent access to food supplies meant that the costs of the treaties could be kept down. Permanent access to resources meant that Indians could feed themselves and still be available for seasonal labor among whites. Permanent access to resources meant that Indians could continue to serve as suppliers of shellfish and other fish to the white market.

based agrarian society" and that "preservation of the tribe's access to fishing grounds" were purposes for the reservation).

Furthermore, the majority's comparison to *Adair* to note that decision's reliance on the express recognition of fishing rights is unpersuasive. That the treaty at issue in *Adair* expressly recognized an exclusive fishing right does little to impair the Tribe's case here. Express treaty recognition of the specific purpose as exclusive is *not* necessary to recognize an activity as a primary purpose of a reservation. *See Adair*, 723 F.2d at 1409 (implying the right to hunt from language that only noted "fishing and gathering rights"). Indeed, *express* recognition of any purpose is not even necessary for that purpose to be a primary one. *Colville Confederated Tribes*, 647 F.2d at 47 & n.8 (implying a reservation of water for both irrigation and fishing purposes from a one paragraph Executive Order that articulates no purpose for the reservation).[14]

The majority does not consider in any detail the evidence submitted by the Tribe regarding its *Winters* claim, instead responding to the Tribe's claims with a narrow and inaccurate reading of the record and of our precedents. I submit that the weight of history and the unequivocal judicial authorities compel an understanding of Indian law that accounts for the unique traditions of Indians. Looking at the record and at the precedents with the requisite historical perpective, I conclude that summary judgment on the reservation of water rights claim was improper.

\*       \*       \*       \*

In sum, because I find no support for barring the Tribe and

---

[14]I am not prepared to say how many fish the Tribe is entitled to or how many gallons of reserved water that implies. Those questions have no answer until there is a definitive determination, after trial, of what water rights were reserved by the Treaty, the question never reached by the majority.

its members from bringing suit — either under the federal common law based on Treaty-secured rights or via § 1983 — I respectfully dissent. I also dissent from the grant of summary judgment on the reserved water rights claim. Once more, because the majority does not decide the question, critical though it is, I do not decide whether the Tribe or its members have alleged a right to preservation of fisheries that *is* protected under federal common law or § 1983.